1    ANDRÉ BIROTTE JR.
     United States Attorney
2    DENNISE D. WILLETT
     Assistant United States Attorney
3    Chief, Santa Ana Branch Office
     JOSHUA M. ROBBINS (Cal. State Bar No.: 270553)
4    Assistant United States Attorney
5        8000 United States Courthouse
         411 West Fourth Street
6        Santa Ana, California 92701
         Telephone:  (714) 338-3538
7        Facsimile:  (714) 338-3708
         Email: joshua.robbins@usdoj.gov
8

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 2 6 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

9    Attorneys for Plaintiff
     UNITED STATES OF AMERICA
10

11              UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13   IN THE MATTER OF THE          No.  SA14-089M
     EXTRADITION OF
14                                 C O M P L A I N T
     DOUGLAS WAYNE SCHNEIDER,
15                                 FOR ARREST WARRANT WITH A VIEW
     A fugitive from the           TOWARDS EXTRADITION; ORDER
16   Government of Canada.
                                   (18 U.S.C. § 3184)
17
                                   (UNDER SEAL)
18

19   _____

20   TO:   Honorable Jean P. Rosenbluth
           United States Magistrate Judge
21         Central District of California

22

23        I, Joshua M. Robbins, being duly sworn, depose and state

24   that I am an Assistant United States Attorney for the Central

25   District of California and act for and on behalf of the

26   Government of Canada pursuant to the Treaty on Extradition in

27   force between the United States of America and Canada signed on

28   December 3, 1971, 27 U.S.T. 983, TIAS No. 8237 (the "Extradition

1  Treaty"), with respect to the fugitive, DOUGLAS WAYNE SCHNEIDER

2  ("SCHNEIDER").

3       In accordance with 18 U.S.C. § 3184, I charge on

4  information and belief as follows:

5       1.   The Extradition Treaty, as amended by Protocols, is in

6  force between the United States and Canada.  Copies of the

7  Extradition Treaty and related Protocol are attached hereto as

8  Exhibits 1 and 1A.

9       2.   Article 11 of the Extradition Treaty provides for the

10 provisional arrest and detention of alleged fugitives pending

11 the submission of a formal request and supporting documents.

12      3.   In accordance with Article 11 of the Extradition

13 Treaty, the Government of Canada has applied to the United

14 States for the provisional arrest of SCHNEIDER with a view

15 toward extradition.

16      4.   Canada's request for extradition (Exhibit 2) includes

17 a photograph of the fugitive; his personal identifying

18 information; an undertaking to formalize the request for

19 extradition; a declaration of the existence of a warrant of

20 arrest issued on January 24, 2014 by a competent judicial

21 authority; a copy of the warrant and the sworn information of a

22 Canadian investigating agent; and excerpts of the relevant

23 Canadian statutes.  See generally Exhibit 3.

24      5.   According to information provided by Canada in the

25 form authorized by the Extradition Treaty, SCHNEIDER, a Canadian

26 citizen, has been charged in the Province of Alberta with the

27 following charges: 1) Trading in unregistered securities, in

28 violation of Sections 75(1)(a)(ii) and 194 of the Securities Act

(Alberta) RSA 2000, C. S-4 as amended ("Securities Act"); (2) Distributing securities without filing and receiving a receipt for a preliminary prospectus and prospectus from the Executive Director of the ASC, in violation of Sections 110 and 194 of the Securities Act; (3) Making a statement that was misleading or untrue, or failing to state a fact necessary to make a statement not misleading, regarding the use of investor funds, in violation of Sections 92(4.1) and 194; and (4) Securities fraud, in contravention of Sections 93 and 194 of the Securities Act.

6.    The aforementioned crimes are extraditable offenses under Article 2(1) of, and Offenses 12, 15, and 28 of the Schedule annexed to, the Extradition Treaty.

7.    According to information provided by Canada in the form authorized by the Extradition Treaty, the warrant for SCHNEIDER's arrest was issued on the basis of the following facts:

a.    It is believed that SCHNEIDER, along with his accomplice Kenneth Charles Fowler ("Fowler"), operated a Ponzi scheme and defrauded approximately 200 investors of as much as $27 million dating back to 2002.

b.    On December 20, 2001, Fowler incorporated The Investment Exchange Mortgage Corporation ("TIE Mortgage") in Alberta, Canada.  TIE Mortgage promotional materials provided by investors indicated that investors were purchasing preferred shares of TIE Mortgage and that such funds were to be lent out under mortgages for a one year period to self-employed parties who already owned a home or commercial property with the rate of

3

1  interest charged to the borrowers providing a base dividend of

2  12% per annum to investors.

3         c.    SCHNEIDER was the main salesperson soliciting

4  investors to invest in TIE Mortgage and SCNEIDER received

5  multiple sales commission payments.  Canadian authorities

6  confirm that SCHNEIDER is not registered to sell such

7  securities.

8         d.    Pursuant to an order of the Court of Queen's

9  Bench of Alberta, Grant Thornton Limited was appointed inspector

10 of TIE Mortgage.  Accordingly, On May 6, 2013 Grant Thornton

11 Limited assembled an Inspector's First Report indicating TIE

12 Mortgage had raised as much as $27 million from approximately

13 200 investors dating back to 2002. According to this report and

14 Canadian authorities, banking records from TIE Mortgage

15 indicated that funds received by investors were deposited into a

16 bank account controlled by Fowler.  Investigations show that

17 these funds were expended in the following ways, contrary to the

18 promotional materials provided by TIE Mortgage to investors:

19              i.  payment of the 12% dividend to investors;

20              ii. payment of commissions to SCHNEIDER and, in

21                  some cases payment towards SCHNEIDER's

22                  credit cards;

23              iii. payment towards a number of credit cards in

24                   the name of Fowler and payments to companies

25                   controlled by Fowler, such payments believed

26                   to be used to finance his personal

27                   lifestyle; and

28

       iv. transfers to a business account and trading
account held in the name of Southwell Group
Inc., an entity controlled by Fowler,
through which Fowler traded securities of
Apple Inc. which trading resulted in
significant losses.

These records showed no evidence of any mortgages or loan fund payments coming into the accounts and no investor funds being invested in loans.

     e.   Contrary to this evidence, unaudited financial statements for TIE Mortgage were prepared, presumably by either SCHNEIDER or Fowler, and provided to investors. These statements attest that TIE Mortgage held in excess of 80 mortgages for a total mortgage amount of $35,189,878 as of March 31, 2012. These statements referred to Fowler and SCHNEIDER as Directors of TIE Mortgage and purported to have been prepared by John Edmunds, CGA. John Edmunds denies having prepared the reports or working for Fowler and SCHNEIDER.

     8.   According to information provided by Canada, SCHNEIDER is now believed to be living at 22 Thorn Oak, Trabuco Canyon, in the Central District of California, and therefore within the jurisdiction of this Court.

     9.   The Government of Canada has provided the following information indicating that there are urgent circumstances warranting SCHNEIDER's provisional arrest: SCHNEIDER is known to have ties to Barbados. According to Canadian authorities, SCHNEIDER resided in Barbados while committing the alleged offenses. Additionally, according to bank records, SCHNEIDER

holds an address in Barbados and U.S. Customs and Border Protection has informed Canadian authorities that SCHNEIDER has traveled multiple times to and from Barbados through Miami, Florida. Various media outlets have reported on SCHNEIDER's arrest warrant and Canadian authorities fear that should SCHNEIDER flee to Barbados, pursuing him there for prosecution will be more difficult or impossible.

10.   Because disclosure of the existence of this Complaint and the requested arrest warrant may cause DOUGLAS WAYNE SCHNEIDER to flee, or may put the arresting officers in greater danger, I request that this complaint and the requested warrant be filed under seal.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

1   WHEREFORE, the undersigned complainant requests that the

2  Court issue a warrant for DOUGLAS WAYNE SCHNEIDER's arrest in

3  accordance with 18 U.S.C. § 3184 and the Extradition Treaty; and

4  that, on such hearing as is required by federal law, if the

5  Court deems the evidence sufficient under the provisions of the

6  Extradition Treaty to sustain the charges for which extradition

7  is sought, the Court certify the same to the Secretary of State

8  so that a warrant may be issued for DOUGLAS WAYNE SCHNEIDER's

9  surrender to the appropriate authorities of Canada.  The United

10  States also requests that the Court take such other actions as

11  may be required under the provisions of the Extradition Treaty

12  and the laws of the United States.

13  Dated: February 26, 2014          Respectfully submitted,

14                                    ANDRÉ BIROTTE JR.
                                      United States Attorney
15
                                      DENNISE D. WILLETT
16                                    Assistant United States Attorney
                                      Chief, Santa Ana Branch Office
17
18  _____

19  JOSHUA M. ROBBINS
    Assistant United States Attorney
20
                                      Attorneys for Plaintiff
21                                    UNITED STATES OF AMERICA

22

23

24  Subscribed and sworn to before
    me this 26th day of February, 2014.
25
        JEAN P. ROSENBLUTH
26  _____
    THE HONORABLE JEAN P. ROSENBLUTH

27

28

EXHIBIT 1

Case 8:14-mj-00089-DUTY   Document 1   Filed 02/26/14   Page 9 of 52   Page ID #:9

T.I.A.S. No. 8237 (U.S. Treaty), 27 U.S.T. 983 (U.S. Treaty), 1976 WL 166697 (U.S. Treaty)

UNITED STATES OF AMERICA

Canada

**Extradition**

Treaty signed at Washington December 3, 1971;

**And agreement amending the treaty**

**Effected by exchange of notes**

Signed at Washington June 28 and July 9, 1974;
Ratification of the treaty, as amended, advised by the Senate of the United States of America December 1, 1975;
Ratified by the President of the United States of America December 12, 1975;
Ratified by Canada February 2, 1976;
Ratifications exchanged at Ottawa March 22, 1976;
Proclaimed by the President of the United States of America May 6, 1976;
Entered into force March 22, 1976.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

**A PROCLAMATION**

TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA

ARTICLE 1

ARTICLE 2

ARTICLE 3

ARTICLE 4

ARTICLE 5

ARTICLE 6

ARTICLE 7

ARTICLE 8

ARTICLE 9

ARTICLE 10

ARTICLE 11

ARTICLE 12

ARTICLE 13

ARTICLE 14

ARTICLE 15

ARTICLE 16

ARTICLE 17

ARTICLE 18

SCHEDULE

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*

*French Text of the Canadian Note*

*The Secretary of State to the Canadian Ambassador*

## BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

### A PROCLAMATION

*1  CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Canada was signed at Washington on December 3, 1971, as amended by an exchange of notes on June 28 and July 9, 1974, the original of which Treaty, as amended, is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, as amended;

The Treaty was ratified by the President of the United States of America on December 12, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Canada;

The respective instruments of ratification were exchanged at Ottawa on March 22, 1976;

It is provided in Article 18 of the Treaty that the Treaty shall enter into force upon the exchange of ratifications;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, as amended, to the end that it shall be observed and fulfilled with good faith on and after March 22, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

Next

DONE at the city of Washington this sixth day of May in the year of our Lord one thousand nine hundred seventy-six and of the Independence of the United States of America the two hundredth.


GERALD R. FORD
[SEAL]


By the President:


JOSEPH JOHN SISCO
*Acting Secretary of State*

## TREATY ON EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND CANADA

The United States of America and Canada, desiring to make more effective the cooperation of the two countries in the repression of crime by making provision for the reciprocal extradition of offenders, agree as follows:

### ARTICLE 1

Each Contracting Party agrees to extradite to the other, in the circumstances and subject to the conditions described in this Treaty, persons found in its territory who have been charged with, or convicted of, any of the offenses covered by Article 2 of this Treaty committed within the territory of the other, or outside thereof under the conditions specified in Article 3(3) of this Treaty.

### ARTICLE 2

(1) Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

(2) Extradition shall also be granted for attempts to commit, or conspiracy to commit or being a party to any of the offenses listed in the annexed Schedule.

(3) Extradition shall also be granted for any offense against a federal law of the United States in which one of the offenses listed in the annexed Schedule, or made extraditable by paragraph (2) of this Article, is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

### ARTICLE 3

*2 (1) For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including air space and territorial waters and vessels and aircraft registered in that Contracting Party or aircraft leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in, that Contracting Party if any such aircraft is in flight, or if any such vessel is on the high seas when the offense is committed. For the purposes of this Treaty an aircraft shall be considered in flight from the moment when power is applied for the purpose of the take-off until the moment when the landing run ends.

(2) In a case when offense 23 of the annexed Schedule is committed on board an aircraft at any time from the moment when all its external doors are closed following embarkation until the moment when any such door is opened for disembarkation, such offense and any other offense covered by Article 2 committed against passengers or crew of that aircraft in connection with such offense shall be considered to have been committed within the territory of a Contracting Party if the aircraft was registered

in that Contracting Party, if the aircraft landed in the territory of that Contracting Party with the alleged offender still on board, or if the aircraft was leased without crew to a lessee who has his principal place of business, or, if the lessee has no such place of business, his permanent residence in that Contracting Party.

(3) When the offense for which extradition has been requested has been committed outside the territory of the requesting State, the executive or other appropriate authority of the requested State shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.

## ARTICLE 4

(1) Extradition shall not be granted in any of the following circumstances:

(i) When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

(ii) When the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State.

(iii) When the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character. If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.

(2) The provisions of subparagraph (iii) of paragraph (1) of this Article shall not be applicable to the following:

(i) A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

*3  (ii) When offense 23 of the annexed Schedule, or an attempt to commit, or a conspiracy to commit, or being a party to the commission of that offense, has been committed on board an aircraft engaged in commercial services carrying passengers.

## ARTICLE 5

If a request for extradition is made under this Treaty for a person who at the time of such request, or at the time of the commission of the offense for which extradition is sought, is under the age of eighteen years and is considered by the requested State to be one of its residents, the requested State, upon a determination that extradition would disrupt the social readjustment and rehabilitation of that person, may recommend to the requesting State that the request for extradition be withdrawn, specifying the reasons therefor.

## ARTICLE 6

When the offense for which extradition is requested is punishable by death under the laws of the requesting State and the laws of the requested State do not permit such punishment for that offense, extradition may be refused unless the requesting State provides such assurances as the requested State considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

## ARTICLE 7

Next

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded.

## ARTICLE 8

The determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law.

## ARTICLE 9

(1) The request for extradition shall be made through the diplomatic channel.

(2) The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the laws of the requesting State describing the offense and prescribing the punishment for the offense, and a statement of the law relating to the limitation of the legal proceedings.

(3) When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4) When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence passed against him in the territory of the requesting State, by a statement showing how much of the sentence has not been served, and by evidence proving that the person requested is the person to whom the sentence refers.

## ARTICLE 10

*4  (1) Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory or to prove that he is the identical person convicted by the courts of the requesting State.

(2) The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when, in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada, or when, in the case of a request emanating from the United States, they are authenticated by an officer of the Department of State of the United States and are certified by the principal diplomatic or consular officer of Canada in the United States.

## ARTICLE 11

(1) In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.

(2) On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.

Next

(3) A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

ARTICLE 12

(1) A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted nor be extradited by that State to a third State unless:

(i) He has left the territory of the requesting State after his extradition and has voluntarily returned to it;

(ii) He has not left the territory of the requesting State within thirty days after being free to do so; or

(iii) The requested State has consented to his detention, trial, punishment for an offense other than that for which extradition was granted or to his extradition to a third State, provided such other offense is covered by Article 2.

*5 (2) The foregoing shall not apply to offenses committed after the extradition.

ARTICLE 13

(1) A requested State upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought.

(2) Among the matters which the requested State may take into consideration are the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

ARTICLE 14

(1) The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2) If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as may be prescribed by the laws of that State, he may be set at liberty and the requested State may subsequently refuse to extradite that person for the same offense.

ARTICLE 15

(1) To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles acquired as a result of the offense or which may be required as evidence shall, if found, be surrendered to the requesting State if extradition is granted.

(2) Subject to the qualifications of paragraph (1) of this Article, the above-mentioned articles shall be returned to the requesting State even if the extradition, having been agreed to, cannot be carried out owing to the death or escape of the person sought.

ARTICLE 16

(1) The right to transport through the territory of one of the Contracting Parties a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

(2) The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

## ARTICLE 17

(1) Expenses related to the transportation of the person sought to the requesting State shall be paid by the requesting State. The appropriate legal officers of the State in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting State before the respective judges and magistrates.

(2) No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the requested State against the requesting State.

## ARTICLE 18

*6 (1) This Treaty shall be ratified and the instruments of ratification shall be exchanged at Ottawa as soon as possible.

(2) This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.

(3) This Treaty shall enter into force upon the exchange of ratifications. [1] It may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Washington this third day of December, one thousand nine hundred seventy one.


FOR THE UNITED STATES OF AMERICA:

(Signature)
William P. Rogers

FOR CANADA:

(Signature)
Mitchell Sharp


SCHEDULE

1. Murder; assault with intent to commit murder.

2. Manslaughter.

Next

3. Wounding; maiming; or assault occasioning bodily harm.

4. Unlawful throwing or application of any corrosive substances at or upon the person of another.

5. Rape; indecent assault.

6. Unlawful sexual acts with or upon children under the age specified by the laws of both the requesting and requested States.

7. Willful nonsupport or willful abandonment of a minor when such minor is or is likely to be injured or his life is or is likely to be endangered.

8. Kidnapping; child stealing; abduction; false imprisonment.

9. Robbery; assault with intent to steal.

10. Burglary; housebreaking.

11. Larceny, theft or embezzlement.

12. Obtaining property, money or valuable securities by false pretenses or by threat of force or by defrauding the public or any person by deceit or falsehood or other fraudulent means, whether such deceit or falsehood or any fraudulent means would or would not amount to a false pretense.

13. Bribery, including soliciting, offering and accepting.

14. Extortion.

15. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

16. Fraud by a banker, agent, or by a director or officer of any company.

17. Offenses against the laws relating to counterfeiting or forgery.

18. Perjury in any proceeding whatsoever.

19. Making a false affidavit or statutory declaration for any extrajudicial purpose.

20. Arson.

21. Any act done with intent to endanger the safety of any person travelling upon a railway, or in any aircraft or vessel or other means of transportation.

*7  22. Piracy, by statute or by law of nations; mutiny or revolt on board a vessel against the authority of the captain or commander of such vessel.

23. Any unlawful seizure or exercise of control of an aircraft, by force or violence or threat of force or violence, or by any other form of intimidation, on board such aircraft.

24. Willful injury to property.

25. Offenses against the bankruptcy laws.

26. Offenses against the laws relating to the traffic in, production, manufacture, or importation of narcotic drugs, Cannabis sativa L., hallucinogenic drugs, amphetamines, barbiturates, cocaine and its derivatives.

27. Use of the mails or other means of communication in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money or property by false pretenses.

28. Offenses against federal laws relating to the sale or purchase of securities.

29. Making or having in possession any explosive substance with intent to endanger life, or to cause severe damage to property.

30. Obstructing the course of justice in a judicial proceeding, existing or proposed, by:
    a) dissuading or attempting to dissuade a person by threats, bribes, or other corrupt means from giving evidence;
    b) influencing or attempting to influence by threat, bribes, or other corrupt means a person in his conduct as a juror; or
    c) accepting a bribe or other corrupt consideration to abstain from giving evidence or to do or to refrain from doing anything as a juror.

[AMENDING AGREEMENT]

*The Canadian Ambassador to the Secretary of State*

Washington, D.C.

June 28, 1974

No. 126

Excellency,

I have the honour to refer to the Treaty on Extradition between the Government of Canada and the Government of the United States signed at Washington on December 3, 1971 and to subsequent discussions between representatives of our two governments concerning the amendment of the said Treaty.

Further to those discussions I now have the honour to propose that the said Treaty be amended as follows:
    (1) That Article 4(2) (i) of the Treaty shall be amended to read: "A kidnapping, murder, or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt or conspiracy to commit, or being a party to

The Honourable

Henry A. Kissinger,

Secretary of State, Washington, D.C. 20520

    the commission of, such an offence with respect to any such person."

(2) That clause 26 of the Schedule annexed to the Treaty shall be amended to read: "Offences against the laws relating to the traffic in, production, manufacture or importation of drugs listed in Schedule I to the Single Convention on Narcotic Drugs of March 30, 1961 [2] and of drugs listed in Schedules I, II and III to the Convention on Psychotropic Substances of February 21, 1971."

*8  If this proposal meets with the approval of your government, I have the further honour to propose that this Note, which is authentic in English and in French, and your reply shall constitute an amendment to the Treaty on Extradition between Canada and the United States referred to above, which shall come into force on the date of the entry into force of the said Treaty and which shall be considered an integral part of the said Treaty.

Accept, Excellency, the assurances of my highest consideration.


(Signature)
M. Cadieux,
Ambassador.



*French Text of the Canadian Note*


*The Secretary of State to the Canadian Ambassador*


DEPARTMENT OF STATE WASHINGTON

July 9, 1974

Excellency:

I have the honor to refer to your note of June 28, 1974, in the English and French languages, relating to amendment of the Treaty on Extradition between the United States of America and Canada, signed at Washington December 3, 1971.

On behalf of the United States of America I confirm the understanding set forth therein and consider that your note and this reply constitute an agreement between the United States and Canada on this matter.

Accept, Excellency, the renewed assurances of my highest consideration.



For the Secretary of State:


Acting Secretary
(Signature)
                                              His Excellency


Marcel Cadieux,
Ambassador of Canada.


Footnotes
1        Mar. 22, 1976.

Treaty signed at Washington December 3, 1971; T.I.A.S. No. 8237 (1976)

2      TIAS 6298; 18 UST 1559.

T.I.A.S. No. 8237

EXHIBIT 1A

| 107TH CONGRESS 2d Session | SENATE | TREATY DOC. 107–11 |
| --- | --- | --- |

## SECOND PROTOCOL AMENDING EXTRADITION TREATY WITH CANADA

### MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA, SIGNED AT OTTAWA ON JANUARY 12, 2001



JULY 11, 2002.—The Protocol was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE

99-118                          WASHINGTON : 2002

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *July 11, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Second Protocol Amending the Treaty on Extradition Between the Government of the United States of America and the Government of Canada, as amended, signed at Ottawa on January 12, 2001. In addition, I transmit, for the information of the Senate, the report of the Department of State with respect to the Second Protocol. As the report explains, the Second Protocol will not require implementing legislation.

The Second Protocol amends the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988.

The Second Protocol, upon entry into force, will enhance cooperation between the law enforcement communities of both nations. The Second Protocol incorporates into the U.S.-Canada Extradition Treaty a provision on temporary surrender of persons that is a standard provision in more recent U.S. bilateral extradition treaties. It also provides for new authentication requirements of documentary evidence, which should streamline the processing of extradition requests.

I recommend that the Senate give early and favorable consideration to the Second Protocol and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

LETTER OF SUBMITTAL

———

DEPARTMENT OF STATE,
*Washington, May 31, 2002.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Second Protocol Amending the Treaty on Extradition Between the Government of the United states of America and the Government of Canada, signed at Ottawa on January 12, 2001 ("Second Protocol"). I recommend that the Second Protocol be transmitted to the Senate for its advice and consent to ratification.

The Second Protocol will strengthen the U.S.-Canada extradition relationship by incorporating a temporary surrender mechanism into the Extradition Treaty Between the United States of America and Canada, signed at Washington on December 3, 1971, as amended by an Exchange of Notes of June 28 and July 9, 1974, and by a Protocol signed at Ottawa on January 11, 1988 ("Extradition Treaty"). The Second Protocol will also streamline the extradition process by modifying the Extradition Treaty's authentication requirements relating to the admissibility of documentary evidence.

A temporary surrender mechanism has become a standard provision in more recent U.S. bilateral extradition treaties. It allows person who have been found extraditable to be temporarily surrendered to one State to stand trial while they are still serving sentences in the other State. Temporary surrender can be an important tool for use in cases where serious crimes have been committed in one country which might go unpunished if trial in that country were to be delayed for a long period while a sentence was being served for crimes committed in the other country. It enables sequential trials of individuals who have committed extraditable offenses in both countries at a time when witnesses and evidence to both crimes are more readily available.

Article 1 of the Second Protocol amends the Extradition Treaty to provide for a new Article 7bis, which will follow Article 7's existing provisions authorizing the State in receipt of an extradition request ("requested State") to delay surrender until after proceedings against a person in that State have been completed or the person's sentence in that State has been served.

New article 7bis(1) provides that if the requested State has granted an extradition request in accordance with the Treaty with respect to a person who already has been convicted and sentenced in the requested State, it may temporarily surrender the person to the requesting State for prosecution. It further provides that the courts of the requested State must not be divested by virtue of the temporary surrender of jurisdiction over any appeal or habeas cor-

pus application relating to the conviction or sentence in the requested State.

Article 7bis(2) provides that the person surrendered pursuant to paragraph (1) must be kept in custody in the requesting State. It also provides that the person must be returned to the requested State within forty-five days after the conclusion of the proceedings for which the person's presence was required or at another time as specified by the requested State, in accordance with conditions determined by the Parties. This provision anticipates that authorities in the United States and Canada, which in some cases will include state-level authorities, will consult to determine appropriate conditions for the temporary surrender of an individual, including arrangements for the transfer and return of the prisoner, as well as any extraordinary matters that may be relevant, such as medical care requirements. Consistent with our normal extradition practice, any case-specific agreements or assurances relating to the temporary surrender would be concluded by the federal authorities on behalf of state authorities. Similar to the language in paragraph (1), Article 7bis(2) also provides that the transfer of the person back to the requested State will not divest the courts of the requesting State of jurisdiction over any appeal or habeas corpus application relating to the matter for which the prisoner was temporarily surrendered.

Article 7bis(3) provides that the time spent in custody in the requesting State may be credited to the sentence in the requested State. In the case of the United States, credit for time served by a person surrendered to Canadian authorities may differ among U.S. state and federal authorities.

Article 7bis(4) provides that the requested State can waive the return of the surrendered person in the event the person's sentence in the requested State expires during the temporary surrender period. Article 7bis(4) provides that in such cases the person's surrender shall be considered a "final surrender" under the Extradition Treaty.

Because temporary surrender is contingent on a grant of extradition, Article 7bis(5) provides that the requesting State does not have to make a further request for the extradition of a person who has been returned to the requested State after having been convicted and sentenced in the requesting State for the offense for which temporary surrender was granted.

Article 7bis(6) provides that a person who has been returned to the requested State, after having been convicted and sentenced during a temporary surrender, must be finally surrendered once the custodial portion of the person's sentence in the requested State has been completed or, if the requested State so specifies, at an earlier time. This provision contemplates that the requested State will finally surrender a person who has been released on parole or under other conditions. It also envisions that the requested State may choose to surrender the person at an earlier time.

Article 7bis(7) recognizes that there may be reasons not to proceed with final surrender even though the person was convicted and sentenced during a temporary surrender. Article 7bis(7) (a) provides that final surrender will not take place when the requesting State advises that it is no longer required because the sentence

imposed in the requesting State has expired or for other reasons. Similarly, Article 7bis(7) (b) provides that the person will not be surrendered to the requesting State in the event the competent authority of the requested State revokes its original grant of extradition.

Article 2 of the Second Protocol will establish a new framework for the admissibility of documentary evidence in support of a request for extradition by replacing existing Article 10(2) of the Extradition Treaty.

Consistent with U.S. extradition law on the admissibility of documentation, new Article 10(2)(a) reiterates the existing requirement that, in the case of a request from Canada, documents be authenticated by an officer of the Department of Justice of Canada and certified by the principal diplomatic or consular office of the United States in Canada. Article 10(2)(b), however, changes existing requirements with respect to requests emanating from the United States, so as to take advantage of changes in Canadian law regarding the admissibility of extradition documents in Canadian courts. Specifically, Article 10(2)(b) eliminates the requirement that the United States have its documentary evidence in support of extradition requests to Canada authenticated by an officer of the U.S. Department of State and certified by the principal diplomatic or consular officer of Canada in the United States. Instead, Article 10(2) (b) streamlines the authentication process by allowing documents to be certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. When the person whose extradition is sought has already been convicted, documents supporting the U.S. request are to be certified by a judicial, prosecuting or correctional authority who can attest to the fact that the documents are accurate. These changes should simplify and thereby reduce the administrative burden of processing extradition requests by the United States.

New Article 10(2) (c) provides an alternative to subparagraphs (a) and (b), by providing that documents may also be certified or authenticated in any other manner accepted by the law of the requested State. This addition will enable both countries to take advantage of any changes to their applicable laws.

Article 3 of the Second Protocol addresses the relationship between the Second Protocol and the Extradition Treaty. Paragraph (1) provides that the Second Protocol will form an integral part of the Extradition Treaty. Paragraph (2) provides for retroactivity, noting that, notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, the Second Protocol will apply in all cases where the request for extradition is made after its entry into force regardless of whether the offense was committed before or after that date. Finally, paragraph (3) provides that the Second Protocol is subject to ratification, and enters into force upon the exchange of instruments of ratification. The Second Protocol would terminate upon termination of the Extradition Treaty.

The Second Protocol does not require implementing legislation. A Technical Analysis explaining in detail the provisions of the Second Protocol is being prepared by the United States negotiating delegation, consisting of the Departments of State and Justice, and will

VIII

be submitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Second Protocol by the Senate at an early date.

Respectfully submitted,

COLIN L. POWELL.

SECOND PROTOCOL AMENDING THE TREATY ON EXTRADITION

BETWEEN

THE GOVERNMENT OF THE UNITED STATES OF AMERICA

AND

THE GOVERNEMENT OF CANADA

Signed at Washington on December 3, 1971,
as amended by an Exchange of Notes at Washington on June 28 and July 9, 1974,
and by a Protocol signed at Ottawa on January 11, 1988

THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF CANADA (hereinafter "the Parties");

RECOGNIZING the close bilateral relationship which exists between them,
reflected in numerous instruments and mechanisms of legal cooperation;

COMMITTED to strengthening legal cooperation in the fight against crime;
and

DESIRING to make more effective the Extradition Treaty between the Parties,
signed at Washington on December 3, 1971 (hereinafter "the Extradition Treaty"), as
amended by an exchange of notes of June 28 and July 9, 1974, and the Protocol to the
Extradition Treaty between the Parties, signed at Ottawa on January 11, 1988
(hereinafter "the Protocol");

HAVE AGREED as follows:

## ARTICLE 1

The Extradition Treaty is amended by adding the following after Article 7:

"Article 7 bis

1.      The requested State, after granting an extradition request made in accordance
with the Extradition Treaty, may temporarily surrender a person who has been
convicted and sentenced in the requested State, in order that the person sought may be
prosecuted in the requesting State. The temporary surrender of the person shall not
divest the Courts in the requested State of jurisdiction over any appeal or habeas corpus
application relating to the conviction or sentence that otherwise may be available under
the laws of the requested State.

(1)

2

2.      A person temporarily surrendered pursuant to paragraph 1 shall be kept in custody in the requesting State. The person shall be returned to the requested State within forty-five (45) days after the conclusion of the proceedings for which the person's presence was required in the requesting State or at another time as specified by the requested State, in accordance with conditions to be determined by the Parties for that purpose.   The return of the person to the requested State shall not divest the Courts in the requesting State of jurisdiction over any appeal or habeas corpus application that otherwise may be available under the laws of that State, in relation to the matter for which the person was temporarily surrendered.

3.      The period of time spent in custody in the requesting State may be credited to the sentence in the requested State.

4.      When the sentence that the person was serving in the requested State expires during the temporary surrender, the requested State may waive the return of the person and the surrender will be considered to be a final surrender.  A "final surrender" is a surrender of a person pursuant to this Treaty other than as provided for by this Article.

5.      Subject to paragraph 7, if a person temporarily surrendered and returned to the requested State has been sentenced to imprisonment in the requesting State for the offence for which the person was temporarily surrendered, the person shall be finally surrendered to the requesting State, in accordance with paragraph 6, without a further request for extradition.

6.      Final surrender shall take place when the person has finished serving the custodial portion of the sentence in the requested State, or at an earlier time specified by the requested State.

7.      Final surrender shall not take place when:

    (a)     the requesting State advises that final surrender is no longer required due to the expiration of the sentence imposed or for other reasons; or

    (b)     after the temporary surrender, the warrant or order for the final surrender of a person sought is revoked by the competent authority of the requested State."

## ARTICLE 2

Article 10(2) of the Extradition Treaty is deleted and replaced by the following text:

"(2)   The documentary evidence in support of a request for extradition or copies of these documents shall be admitted in evidence in the examination of the request for extradition when:

    (a)     in the case of a request emanating from Canada, they are authenticated by an officer of the Department of Justice of Canada and are certified by the principal diplomatic or consular officer of the United States in Canada;

(b)     in the case of a request emanating from the United States for a person who is sought for prosecution, they are certified by a judicial authority or prosecutor who attests that the evidence is available for trial and is sufficient to justify prosecution under the law of the prosecuting jurisdiction. In the case of a request emanating from the United States for a person who is sought in connection with a conviction, the documents must be certified by a judicial, prosecuting or correctional authority who attests to the fact that the documents are accurate; or

(c)     they are certified or authenticated in any other manner accepted by the law of the requested State."

## ARTICLE 3

1.     This Second Protocol shall form an integral part of the Extradition Treaty.

2.     Notwithstanding paragraph (2) of Article 18 of the Extradition Treaty, this Second Protocol shall apply in all cases where the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

3.     This Second Protocol shall be subject to ratification, and shall enter into force upon the exchange of instruments of ratification. It shall terminate upon termination of the Extradition Treaty.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Second Protocol.

DONE in duplicate at *Ottawa*, this *Twelfth* day of *January* 2001 in the English and French languages, the two texts being equally authentic.

_____
FOR THE GOVERNMENT OF
THE UNITED STATES OF
AMERICA

_____
FOR THE GOVERNMENT
OF CANADA

EXHIBIT 2

Department of Justice
Canada

Ministère de la Justice
Canada

# INFORMATION TO OBTAIN PROVISIONAL ARREST WARRANT

1.   **Request by:**      **Jonathan Denis, Solicitor General, Attorney General, and Minister of Justice for the province of Alberta**

2.   **Date:**      **February 6, 2014**

3.   **Subject:**

   (a) **Name:**  Douglas Wayne Schneider

   (b) **Date & Place of birth:**      **March 5, 1957** / Medicine Hat, Alberta Canada

   (c) **Citizenship:**      **Canadian**

   (d) **Description:**  Height:      **180cm/5'11"**      Weight: **88kg/185lb**
         Eyes:      **Green**      Hair: **Brown**
         Marks:      **Unknown**

   (e) **Photograph availability and location:**  Attached.

      **Fingerprints availability and location:**  Unknown.

   (f) **Present location/address of subject:**

   - Schneider is believed to be renting a room from a gentleman identified as P. Chang (internet checks indentify him as Mr. Pingsheng Sheng Chang), who resides at 22 - Thorn Oak, Trubuco Canyon, CA 92679-4200.

   - Schneider's last known cell phone number is 530.448.4136.
   - Schneider is driving a White Mercedes 300C (bearing California licence plate 6XPD825) which was also parked at 22 - Thorn Oak, Trubuco Canyon, CA 92679-4200.

#4741085 v2

- Schneider appears to be working in a real estate office or a finance company located in a building located at 16485 - Laguna Canyon Road, Irvine, CA 92618.  Also, Schneider appears to be employed with City Wide Home Loans at an office located at Suite 200, 10 – Bunsen, Irvine, CA, with his position described as "Business Development".

4.   **If provisionally arrested, extradition will be requested within a prescribed number of days:   Yes**

5.   **Wanted in Canada:**        __X__ **to stand trial** _____ **to serve sentence**
     _____ **for sentencing** _____
     **other:** _____

6.   **List of Offence(s) and Penalties (including section numbers):**

Traded in securities without registration with the Executive Director of the Alberta Securities Commission (the "ASC") as a sales person, in contravention of Section 75(1)(a)(ii) of the *Securities Act* (Alberta) RSA 2000, C. S-4 as amended ("Securities Act"), and therefore committed an offence contrary to Section 194 of the Securities Act.

Engaged in a distribution of securities without filing and receiving a receipt for a preliminary prospectus and prospectus from the Executive Director of the ASC, in contravention of Section 110 of the Securities Act and therefore committed an offence contrary to Section 194 of the Securities Act.

Made a statement that was misleading or untrue, or failed to state a fact necessary to make a statement not misleading, regarding the use of investor funds in contravention of Section 92(4.1) of the Securities Act and therefore committed an offence contrary to Section 194 of the Securities Act.

Directly or indirectly engaged or participated in an act, practice or course of conduct in relation to securities that he knew or reasonably ought to have known would perpetrate a fraud on a person or persons, in contravention of Section 93 of the Securities Act and therefore committed an offence contrary to Section 194 of the Securities Act.

Section 194 of the Securities Act provides that a person that contravenes Alberta securities laws is guilty of an offence and is liable to a fine of not more than $5,000,000 or to imprisonment of not more than 5 years less a day, or to both.

7.   **Particulars of the Information or Judgement of Conviction and Sentence  (i.e. date issued, by whom, name of court, etc.):** *include copy*

The Information was sworn on January 24, 2014 by Viola Pickering, Securities Investigator with the ASC and issued by Alberta Justice of the Peace W.D. Milne on January 24, 2014.

8.   **Particulars of the Warrant of Arrest (i.e. date issued, by whom, name of court):** * *include copy*

The Warrant of Arrest for Schneider was issued on January 24, 2104 by the Calgary Provincial Court of Alberta.

9.   **Synopsis of the Facts:**

**Background**
On December 20, 2001, Kenneth Charles Fowler ("Fowler") incorporated The Investment Exchange Mortgage Corporation ("TIE Mortgage") in Alberta and began raising capital.  TIE Mortgage promotional material provided to investors indicated that investors were purchasing preferred shares of TIE Mortgage and that the investor funds were to be lent out under mortgages for a one year period to self-employed parties who already owned a home or commercial property with the rate of interest charged to the borrowers providing a base dividend rate of 12% per annum to investors.

Schneider was the main salesperson soliciting investors to invest into TIE Mortgage and  Schneider received multiple sale commission payments for this service.

Investor testimony indicates that Fowler and Schneider solicited them to invest in TIE Mortgage, advised them that the funds would be used to invest in mortgages and that investors were not qualified under any appropriate prospectus exemption for the distribution of securities of TIE Mortgage.

Further, Schneider did not meet the legislative requirements of being registered to sell securities.

**Improper Use of Investor Funds**

Pursuant to an order of the Court of Queen's Bench of Alberta, Grant Thornton Limited was appointed inspector of TIE Mortgage. Based on the May 6, 2013 Inspector's First Report by Grant Thornton Limited there may have been approximately 200 investors and as much as $27 million raised from investors in TIE Mortgage dating back to 2002. Prosecutions under the Securities Act must occur within 6 years of the offence and banking analysis conducted by ASC staff has determined that approximately $11 million was obtained from investors in TIE Mortgage within the relevant 6 year time frame.

Additionally, evidence obtained regarding banking records of TIE Mortgage indicates that essentially all funds received by TIE Mortgage came from investors into a bank account controlled by Fowler. Our investigation shows that the funds invested in TIE Mortgage was expended as follows:

-   payment of the 12% dividend to investors;
-   payment of commissions to Schneider and, in some cases, payment towards Schneider's credit cards;
-   payment towards a number of credit cards in the name of Fowler and payments to companies controlled by Fowler, such payments believed to be used to finance his personal lifestyle; and
-   transfers to a business account and trading account held in the name of Southwell Group Inc., an entity controlled by Fowler, through which Fowler traded securities of Apple Inc. which trading resulted in significant losses.

Bank records showed no evidence of any mortgage or loan fund payments coming into the accounts and no investor funds being invested in loans in the relevant 6 year period. This is in direct contradiction of what was told to investors. Despite this lack of investment in mortgages, unaudited financial statements for TIE Mortgage were prepared by either Fowler or Schneider and provided to us by an investor. These statements attest that there were in excess of 80 mortgages held by TIE Mortgage for a total mortgages amount of $35,189,878 as of March 31, 2012. These financial statements referred to Fowler and Schneider as Directors of TIE Mortgage

and claimed to have been prepared by John Edmunds, CGA, who attested that he had not prepared the financials or done any accounting work for Fowler or Schneider. Further, investors told us that portions of these financial statements were shown to them as parts of presentations put on to solicit investment in TIE Mortgage.

**Result of TIE Mortgage Fundraising**

On November 21, 2012, a cease trade order was issued by the ASC against TIE Mortgages which prevented the company from raising any more capital from the investing public. Subsequently, the 12% dividend payments to investors ceased. Given this and the information gleaned from the bank records, it appears clear that TIE Mortgage was able to pay the 12% dividend payments to previous investors by taking in new investor funds with management using any excess investor funds for their own purposes in the mold of a typical Ponzi scheme fraud.

It is believed that all investor funds in TIE Mortgages have been lost other than those amounts returned by way of 12% dividend payments. Many investors involved were seniors and were relying on the monthly dividend for their retirement; they have been severely harmed as they have been deprived of the interest payments as well as their underlying retirement capital.

10.    **Prosecuting Attorney Name & Phone Number:**

Don Young
Chief Litigation Counsel
Alberta Securities Commission
(403) 297-2642

11.    **Miscellaneous:**

Schneider was sanctioned by the ASC in 2005 for committing breaches of the Securities Act.

Regarding the apprehension of Schneider, staff of the ASC has been in contact with:

Mr. Jeffrey R. Harris

#4741085 v2

Federal Bureau of Investigation
Assistant Legal Attache
U.S. Consulate Vancouver
(604) 694-6527
harrisj2@state.gov
1075 - West Pender Street
Vancouver, British Columbia
V6E 2M6

## 12.   Grounds for urgency: (be as specific as possible)

ASC Staff is concerned that Schneider will leave the United States to a
jurisdiction where pursuing him for prosecution will be more difficult or
impossible.  This concern is based on the following factors:

-   ASC Staff believes Schneider has connections to Barbados and resided
    there while the alleged offences were committed, travelling to Canada to
    solicit investors in TIE Mortgage before returning to Barbados.  ASC
    Staff were specifically informed by Schneider's sister that prior to
    moving to Irvine, California he was residing in Barbados.  Further,
    banking records indicate he holds a mailing address in Barbados and
    testimony of investors indicated that Schneider told them that he resided
    in Barbados and that he owned real estate and a horse ranch in Barbados.

-   U.S. Customs and Border Protection has informed ASC Staff that
    Schneider has made multiple trips to Barbados through Miami, Florida in
    the last year.

-   Fowler, Schneider's accomplice regarding the alleged breaches, was
    issued a warrant for his arrest for failing to appear for an examination
    pursuant to civil proceeding.  ASC Staff have been informed that a
    person attending at Fowler's last known address was told that he was
    rumoured to have moved to Belize.

-   Various media outlets have reported that the warrant for Schneider's
    arrest has been issued making it likely that Schneider is aware of the
    warrant.

13.   CPIC check done:        YES
      *include copy

MOVES Date Of Issue      2006/Sep/21
Date Of Image Capture    2006/Sep/21 03:18 PM
Office Code              P245
Status                   V



WARRANT FOR ARREST
Mandat d'arrestation

AG 421
REV 02/89
CRIMINAL CODE FORM 7
Code criminel formule 7

14  02881

CANADA

PROVINCE OF ALBERTA/Province d'Alberta

FILE-TK NO/No de dossier: 140097494P1-02-001          PAGE 01

POLICE FILE NO/No du dossier de police: ENF-009055

ENFORCEMENT AGENCY/Organisme chargé de l'application de la loi: ASC

TO THE PEACE OFFICERS IN THE SAID PROVINCE:          Aux agents de la paix de ladite province:

THIS WARRANT IS ISSUED FOR THE ARREST OF          Le présent mandat est décerné pour l'arrestation de

"SCHNEIDER" DOUGLAS, WAYNE          SEX/sexe: M

DATE OF BIRTH/Date de naissance: 1957MAR05

OF/de    NFA
         AB

HEREINAFTER CALLED THE ACCUSED.          ci-après appelé le prévenu.

WHEREAS THE ACCUSED HAS BEEN CHARGED THAT          ATTENDU QUE le prévenu a été inculpé d'avoir

BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR CALGARY,
ALBERTA, TRADED IN SECURITIES OF THE INVESTMENT EXCHANGE MORTGAGE
CORPORATION WITHOUT REGISTRATION WITH THE EXECUTIVE DIRECTOR OF THE
ALBERTA SECURITIES COMMISSION AS A SALES PERSON, IN CONTRAVENTION OF
SUBSECTION 75(1)(A)(II) OF THE SECURITIES ACT, RSA 2000, C. S-4, AS
AMENDED, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO SECTION 194 OF
THAT ACT.
                              CROWN PROCEEDS SUMMARILY

**** ADDITIONAL CHARGES ****:

    140097494P1-02-002 - 194(1) SEC BETWEEN JANUARY 24, 2008 AND JANUARY          ASC    ENF-009055
    01, 2013 AT CALGARY  (SUMMARY)
    140097494P1-02-003 - 194(1) SEC BETWEEN JANUARY 24, 2008 AND JANUARY          ASC    ENF-009055
    01, 2013 AT CALGARY  (SUMMARY)
    140097494P1-02-004 - 194(1) SEC BETWEEN JANUARY 24, 2008 AND JANUARY          ASC    ENF-009055
    01, 2013 AT CALGARY  (SUMMARY)

AND WHEREAS:          ET ATTENDU;

There are reasonable grounds to believe that it is          qu'il y a des motifs raisonnables de croire qu'il est
necessary in the public interest to issue this warrant          nécessaire dans l'intérêt public de décerner le présent
for the Arrest of the Accused.    (507(4), 512(1))          mandat pour l'arrestation du prévenu.  (507(4), 512(1))

THIS IS, THEREFORE, TO COMMAND YOU, IN HER MAJESTY'S NAME,          À CES CAUSES, LES PRÉSENTES ONT POUR OBJET DE VOUS
FORTHWITH TO ARREST THE SAID ACCUSED AND TO BRING HIM          ENJOINDRE, et non de Sa Majesté, d'arrêter immédiatement
BEFORE                                                          ledit prévenu et de l'amener devant
    ME OR ANY OTHER JUSTICE OF THE PEACE IN AND FOR THE PROVINCE OF ALBERTA,

TO BE DEALT WITH ACCORDING TO LAW.          pour qu'il soit traité selon la loi.

TERMS AND CONDITIONS IF ANY:
Modalités :

DATED THIS/Fait le 24TH DAY OF JANUARY, 2014   AT/à CALGARY
IN THE PROVINCE OF ALBERTA.                                    dans la province d'Alberta.

ISSUED BY: MILNE, W.D.                                         S. SOTO

                                          PROVINCIAL JUDGE OR JUSTICE, REGISTRAR, CLERK OF THE COURT
                                          Juge provincial ou juge de paix, registraire, greffier du tribunal

CANADA                    ENDORSEMENT OF WARRANT          FORM 29          Formula 29
PROVINCE OF ALBERTA       Visa du mandat                  CRIMINAL CODE    Code criminel
Province d'Alberta                                        SECTION 499 and  Article 499 et
                                                          SUBSECTION 507(6) Paragraphe 507(6)

WHEREAS THIS WARRANT IS ISSUED UNDER SECTION 507, 508 OR          ATTENDU QUE le présent mandat est décerné en vertu des
512 OF THE CRIMINAL CODE IN RESPECT OF AN OFFENCE OTHER          articles 507, 508 ou 512 du code criminel, relativement à
THAN AN OFFENCE MENTIONED IN SECTION 522 OF THE CRIMINAL          une infraction autre que celles visées à l'article 522,
CODE, I HEREBY AUTHORIZE THE RELEASE OF THE ACCUSED              j'autorise par les présentes la mise en liberté du prévenu
PURSUANT TO SECTION 499 OF THAT ACT.                            en application de l'article 499 de cette loi.

DATED THIS/Fait le 24TH DAY OF JANUARY, 2014   AT/à CALGARY
IN THE PROVINCE OF ALBERTA.                                    dans la province d'Alberta.

                                          CLERK OF THE COURT FOR THE JUSTICE OF THE PEACE
                                          Greffier du tribunal pour le juge de paix

ORIGINATING COURT:
CALGARY PROVINCIAL COURT
CALGARY COURTS CENTRE
601 5TH STREET S.W
CALGARY, ALBERTA
T2P-5P7

WARRANT EXECUTED THIS _____ DAY OF _____, _____   TIME _____   PLACE _____

                                          PEACE OFFICER

*****************************END OF DOCUMENT*****************************



CANADA
PROVINCE OF ALBERTA
PROVINCE D'ALBERTA

*This is Exhibit "A"
referred to in the letter
dated January 24, 2014
of Janet McClellan Qt.*

FILE NO. 140097494P1
POLICE ASC   # ENF-009055

INFORMATION
ON BEHALF OF HER MAJESTY THE QUEEN

DENONCIATION
AU NOM DE SA MAJESTE LA REINE

THIS IS THE INFORMATION OF

VIOLA PICKERING

OF 600, 250-5TH STREET SW, CALGARY, AB, T2P 0R4

HEREINAFTER CALLED THE INFORMANT

LES PRESENTES CONSTITUENT

*Securities Investigator*
(OCCUPATION)

CI-APRES APPELE LE DENONCIATEUR

THE INFORMANT SAYS THAT HE HAS
REASONABLE GROUNDS TO BELIEVE
AND DOES BELIEVE THAT:

LE DENONCIATEUR DECLARE QU'IL A
DES MOTIFS RAISONNABLES
DE CROIRE ET QU'IL CROIT QUE:

01   KENNETH CHARLES FOWLER (DOB 1950-12-12) OF NFA, AB
     AND
02   DOUGLAS WAYNE SCHNEIDER (DOB 1957-03-05) OF NFA, AB

COUNT   1: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
CALGARY, ALBERTA, TRADED IN SECURITIES OF THE INVESTMENT EXCHANGE
MORTGAGE CORPORATION WITHOUT REGISTRATION WITH THE EXECUTIVE DIRECTOR
OF THE ALBERTA SECURITIES COMMISSION AS A SALES PERSON, IN
CONTRAVENTION OF SUBSECTION 75(1)(A)(II) OF THE SECURITIES ACT, RSA
2000, C. S-4, AS AMENDED, AND DID THEREBY COMMIT AN OFFENCE CONTRARY
TO SECTION 194 OF THAT ACT.

( S )

COUNT   2: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
CALGARY, ALBERTA, ENGAGED IN A DISTRIBUTION OF SECURITIES OF THE
INVESTMENT EXCHANGE MORTGAGE CORPORATION WITHOUT FILING AND RECEIVING
A RECEIPT FOR A PRELIMINARY PROSPECTUS AND PROSPECTUS FROM THE
EXECUTIVE DIRECTOR OF THE ALBERTA SECURITIES COMMISSION, IN
CONTRAVENTION OF SECTION 110(1) OF THE SECURITIES ACT, RSA 2000, C.
S-4, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO SECTION 194 OF
THAT ACT.

( S )

COUNT   3: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
CALGARY, ALBERTA, MADE A STATEMENT THAT WAS MISLEADING OR UNTRUE, OR
FAILED TO STATE A FACT NECESSARY TO MAKE A STATEMENT NOT MISLEADING,
TO WIT: FUNDS INVESTED IN THE INVESTMENT EXCHANGE MORTGAGE
CORPORATION WOULD BE USED TO MAKE SHORT TERM LOANS OR MORTGAGES TO
THIRD PARTIES, IN CONTRAVENTION OF SECTION 92(4.1) OF THE SECURITIES
ACT, RSA 2000, C. S-4, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO
SECTION 194 OF THAT ACT.

( S )



COUNT  4: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
CALGARY, ALBERTA, DIRECTLY OR INDIRECTLY ENGAGED OR PARTICIPATED IN
AN ACT, PRACTICE OR COURSE OF CONDUCT IN RELATION TO SECURITIES OF
THE INVESTMENT EXCHANGE MORTGAGE CORPORATION THAT THEY KNEW OR
REASONABLY OUGHT TO HAVE KNOWN WOULD PERPETRATE A FRAUD ON A PERSON
OR PERSONS, IN CONTRAVENTION OF SECTION 93 OF THE SECURITIES ACT, RSA
2000, C. S-4, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO SECTION
194 OF THAT ACT.

                                                    ( S )

SWORN BEFORE ME THIS
ASSERMENTE DEVANT MOI

24 DAY OF JANUARY    , 2014,
AT CALGARY, ALBERTA

------------------------------        ------------------    ------------------
JUSTICE OF THE PEACE W. D. Milne       SIGNATURE OF          SIGNATURE DU
JUGE DE PAIX    Justice of the Peace   INFORMANT             DENONCIATEUR
            in and for the Province of Alberta

ACCUSED                    ENDORSEMENTS
ALL WARRANT: JANUARY 24, 2014, CAL #CMO   08:00         ID: C013326027
                                                       ID: C013922823

January 24, 2014

ALLEGATIONS CONSIDERED
FORM 7 WARRANT TO ISSUE
IN THE PUBLIC INTEREST

CALGARY
ALBERTA
JAN 24 2014
HEARING
OFFICE

            W. D. Milne
        Justice of the Peace
    in and for the Province of Alberta

Relevant Securities Act (Alberta) Sections re: Schneider Charges

**Requirement to be registered**
75(1) Unless registered in accordance with Alberta securities laws, a person or company shall not act as
    (a) a dealer,
    (b) an adviser, or
    (c) an investment fund manager.

(2) Unless registered in accordance with Alberta securities laws, an individual shall not, directly or indirectly,
    (a) act as a dealer on behalf of a person or company that is required to be registered under subsection (1),
    (b) act as an adviser on behalf of a person or company that is required to be registered under subsection (1), or
    (c) perform a prescribed function or duty for a person or company that is required to be registered under subsection(1).

**Filing prospectus**
110(1) No person or company shall trade in a security on the person's or company's own account or on behalf of any other person or company if the trade would be a distribution of the security unless
    (a) a preliminary prospectus has been filed and the Executive Director has issued a receipt for it, and
    (b) a prospectus has been filed and the Executive Director has issued a receipt for it.

**Prohibitions respecting representations**
92(4.1) No person or company shall make a statement that the person or company knows or reasonably ought to know
    (a) in any material respect and at the time and in the light of the circumstances in which it is made,
        (i) is misleading or untrue, or
        (ii) does not state a fact that is required to be stated or that is necessary to make the statement not misleading,
    and
    (b) would reasonably be expected to have a significant effect on the market price or value of a security or an exchange contract.

**Prohibited transaction**
93 No person or company shall, directly or indirectly, engage or participate in any act, practice or course of conduct relating to a security or exchange contract that the person or company knows or reasonably ought to know will
    (a) result in or contribute to
        (i) a false or misleading appearance of trading activity in a security or an exchange contract, or
        (ii) an artificial price for a security or an exchange contract,
    or
    (b) perpetrate a fraud on any person or company.

**General offences and penalties**

**194(1)** A person or company that contravenes Alberta securities laws is guilty of an offence and is liable to a fine of not more than $5,000,000 or to imprisonment for a term of not more than 5 years less a day, or to both.

**(2)** No person or company is guilty of an offence under section 92(4.1) or 221.1 if the person or company, as the case may be, did not know, and in the exercise of reasonable diligence would not have known, that the statement referred to in that subsection was misleading or untrue or that it omitted to state a fact that was required to be stated or that was necessary to make the statement not misleading in light of the circumstances in which it was made.

EXHIBIT 3



CANADA
PROVINCE OF ALBERTA
PROVINCE D'ALBERTA

FILE NO. 140097494P1
POLICE ASC   # ENF-009055

*This is Exhibit "A"
referred to in the letter
dated January 24, 2014
of Janet McClellan Q.*

INFORMATION
ON BEHALF OF HER MAJESTY THE QUEEN

DENONCIATION
AU NOM DE SA MAJESTE LA REINE

THIS IS THE INFORMATION OF          LES PRESENTES CONSTITUENT

VIOLA PICKERING          *Securities Investigator*

(OCCUPATION)

OF 600, 250-5TH STREET SW, CALGARY, AB, T2P 0R4

HEREINAFTER CALLED THE INFORMANT          CI-APRES APPELE LE DENONCIATEUR

THE INFORMANT SAYS THAT HE HAS          LE DENONCIATEUR DECLARE QU'IL A
REASONABLE GROUNDS TO BELIEVE          DES MOTIFS RAISONNABLES
AND DOES BELIEVE THAT:          DE CROIRE ET QU'IL CROIT QUE:

01   KENNETH CHARLES FOWLER (DOB 1950-12-12) OF NFA, AB
     AND
02   DOUGLAS WAYNE SCHNEIDER (DOB 1957-03-05) OF NFA, AB

   COUNT   1: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
   CALGARY, ALBERTA, TRADED IN SECURITIES OF THE INVESTMENT EXCHANGE
   MORTGAGE CORPORATION WITHOUT REGISTRATION WITH THE EXECUTIVE DIRECTOR
   OF THE ALBERTA SECURITIES COMMISSION AS A SALES PERSON, IN
   CONTRAVENTION OF SUBSECTION 75(1)(A)(II) OF THE SECURITIES ACT, RSA
   2000, C. S-4, AS AMENDED, AND DID THEREBY COMMIT AN OFFENCE CONTRARY
   TO SECTION 194 OF THAT ACT.

                                        ( S )

   COUNT   2: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
   CALGARY, ALBERTA, ENGAGED IN A DISTRIBUTION OF SECURITIES OF THE
   INVESTMENT EXCHANGE MORTGAGE CORPORATION WITHOUT FILING AND RECEIVING
   A RECEIPT FOR A PRELIMINARY PROSPECTUS AND PROSPECTUS FROM THE
   EXECUTIVE DIRECTOR OF THE ALBERTA SECURITIES COMMISSION, IN
   CONTRAVENTION OF SECTION 110(1) OF THE SECURITIES ACT, RSA 2000, C.
   S-4, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO SECTION 194 OF
   THAT ACT.

                                        ( S )

   COUNT   3: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
   CALGARY, ALBERTA, MADE A STATEMENT THAT WAS MISLEADING OR UNTRUE, OR
   FAILED TO STATE A FACT NECESSARY TO MAKE A STATEMENT NOT MISLEADING,
   TO WIT" FUNDS INVESTED IN THE INVESTMENT EXCHANGE MORTGAGE
   CORPORATION WOULD BE USED TO MAKE SHORT TERM LOANS OR MORTGAGES TO
   THIRD PARTIES, IN CONTRAVENTION OF SECTION 92(4.1) OF THE SECURITIES
   ACT, RSA 2000, C. S-4, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO
   SECTION 194 OF THAT ACT.

                                        ( S )



PAGE    2
140097494P1

COUNT  4: BETWEEN JANUARY 24, 2008, AND JANUARY 1, 2013, AT OR NEAR
CALGARY, ALBERTA, DIRECTLY OR INDIRECTLY ENGAGED OR PARTICIPATED IN
AN ACT, PRACTICE OR COURSE OF CONDUCT IN RELATION TO SECURITIES OF
THE INVESTMENT EXCHANGE MORTGAGE CORPORATION THAT THEY KNEW OR
REASONABLY OUGHT TO HAVE KNOWN WOULD PERPETRATE A FRAUD ON A PERSON
OR PERSONS, IN CONTRAVENTION OF SECTION 93 OF THE SECURITIES ACT, RSA
2000, C. S-4, AND DID THEREBY COMMIT AN OFFENCE CONTRARY TO SECTION
194 OF THAT ACT.

( S )

SWORN BEFORE ME THIS
ASSERMENTE DEVANT MOI

24  DAY OF JANUARY    , 2014,
AT CALGARY, ALBERTA

-------------------------------          ----------------------------
JUSTICE OF THE PEACE                     SIGNATURE OF       SIGNATURE DU
JUGE DE PAIX                             INFORMANT          DENONCIATEUR

W. D. Milne
Justice of the Peace
in and for the Province of Alberta

ACCUSED                          ENDORSEMENTS
ALL WARRANT: JANUARY 24, 2014, CAL #CMO      08:00          ID: C013326027
                                                            ID: C013922823

January 24, 2014

ALLEGATIONS CONSIDERED
FORM 7 WARRANT TO ISSUE
IN THE PUBLIC INTEREST

CALGARY
ALBERTA
JAN 24 2014
HEARING
OFFICE

W. D. Milne
Justice of the Peace
in and for the Province of Alberta

EXHIBIT 4



**ASC**
Alberta Securities Commission

# MEMORANDUM

| | | | |
|---|---|---|---|
| **TO:** | Ms. Jane McClellan, Q.C.<br>Organized Crime Prosecutor<br>Specialized Prosecutions (Calgary) | **FILE NO.:** | ENF-009055 |

| | | | |
|---|---|---|---|
| **FROM:** | Vi Pickering<br>Securities Investigator | **DIRECT LINE:** | 403.297.7745 |
| | | **DATE:** | January 24, 2014 |

**SUBJECT:**   **EXTENSION OF ARREST WARRANT RADIUS TO CANADA WIDE**

*Background*

On December 20, 2001, Kenneth Charles Fowler ("**Fowler**") incorporated The Investment Exchange Mortgage Corporation ("**TIE Mortgage**") in Alberta and began raising capital. TIE Mortgage promotional material provided to investors indicated that investors were purchasing preferred shares of TIE Mortgage, described as Mortgage Investment Corporation ("**MIC**"). The investor funds were to be lent out for a one year period to self-employed businessmen who already owned a home or commercial property. There was a higher rate of interest charged to the borrower, which provided a base dividend rate of 12 % per annum to investors.

Based on the May 06, 2013 Grant Thornton's Inspector's First Report there may have been approximately 200 Investors and as much as $27 million raised from investors through TIE Mortgage dating back to 2002. The ASC banking analysis calculated to reflect the relevant six (6) year period indicates that in excess of $11 million was obtained from investors.

The banking information indicates that the investor funds were used by Fowler for his own personal use, transferred to a Southwell Group Inc. ("**Southwell**") trading account, a company solely owned by Fowler, and used to pay investor dividend payments. There is no evidence that funds were used in the relevant period to fund second and third mortgages or lent to small business owners. Fowler had sole signing authority on the bank accounts. The banking evidence indicates that the sources of funds are from investors and that there is no evidence of any mortgages or loan fund payments coming into the accounts.

Douglas Wayne Schneider ("**Schneider**") was the sales person soliciting investors to invest into TIE Mortgage; Schneider benefited by way of commission payments from Fowler in excess of $400,000 during the relevant six (6) year period.

The investor testimony indicates that Fowler and Schneider solicited them to invest and advised them that the funds would be used to invest in mortgages; investors were not qualified under any appropriate exemption. Fowler and Schneider did not meet the legislative requirements of qualifying investors, holding registration to sell securities, filing a prospectus or offering memorandum, and making any Form 45-106 filings.

### _Request_

The whereabouts of Fowler is unknown; he was the subject of civil proceedings related to his capital raising:

- On October 1, 2014, Fowler was issued a warrant for his arrest related to a Civil Contempt Order related to failing to appear for an examination pursuant to the proceedings.

- On May 28, 2013 Fowler's home, 76 - Edgehill Crescent NW, Calgary, Alberta was the subject of a Receivership Order in favour of Grant Thornton Limited; the home was transferred to new owners on July 25, 2013.

On November 7, 2013 I received information from Schneider's sister, Debra Phaff, indicating that Schneider was residing at an undisclosed address in Irvine, California, however had previously been residing in Barbados.

Both Fowler and Schneider have previous sanction history with the ASC.

The ASC would like to request an extension of the Alberta arrest warrant from Alberta wide to Canada wide warrant for the arrest of both Schneider and Fowler.


V. Pickering

EXHIBIT 5

U.S. Department of Justice

*Criminal Division*
*Office of International Affairs*

MEW:KJH:RC:bk
95-100-23376

Office of International Affairs
1301 New York Avenue, N.W.
Suite 800
Washington, DC 20005

Direct:   (202) 616-4849
Fax:      (202) 514-0080
Email:   Roman.Chaban@usdoj.gov

February 11, 2014

<u>Via Email</u>

Scott Garringer
<u>Assistant United States Attorney</u>
U.S. Attorney's Office
312 N. Spring Street, Suite 1300
Los Angeles, CA 90012

  Re: **URGENT** Request from Canada for the Provisional Arrest of Douglas Wayne
SCHNEIDER

Dear AUSA Garringer,

  Pursuant to Article 11 of the Treaty on Extradition Between the United States of America
and Canada signed at Washington on December 3, 1971, as Amended by an Exchange of Notes
on June 28 and July 9, 1974, Canadian authorities have requested the provisional arrest of
fugitive Douglas Wayne SCHNEIDER. SCHNEIDER, a Canadian citizen, is wanted in Canada
to stand trial on the following charges:  (1) Traded in securities without registration with the
Executive Director of the Alberta Securities Commission ("ASC") as a sales person, in
contravention of Section 75(1)(a)(ii) of the Securities Act (Alberta) RSA 2000, C. S-4 as
amended ("Securities Act"), and therefore committed an offence contrary to Section 194 of the
Securities Act; (2) Engaged in a distribution of securities without filing and receiving a receipt
for a preliminary prospectus and prospectus from the Executive Director of the ASC, in
contravention of Section 110 of the Securities Act and therefore committed an offense contrary
to Section 194 of the Securities Act; (3) Made a statement that was misleading or untrue, or
failed to state a fact necessary to make a statement not misleading, regarding the use of investor
funds in contravention of Section 92(4.1) of the Securities Act and therefore committed an
offence contrary to Section 194 of the Securities Act; and (4) Directly or indirectly engaged or
participated in an act, practice or course of conduct in relation to securities that he knew or
reasonably ought to have known would perpetrate a fraud on a person or persons, in
contravention of Section 93 of the Securities Act and therefore committed an offense contrary to
Section 194 of the Securities Act.

  Currently, SCHNEIDER is living at 22 Thorn Oak, Trubuco Canyon, California 92679.
For more information, you can contact Deputy US Marshal Christopher Burtt at
Christopher.Burtt@usdoj.gov or (714) 338-4610.  Please note that the U.S. Marshals should

execute this warrant once it is obtained.

The Assistant U.S. Attorney to whom this case is assigned should review the attached draft complaint and execute it before a magistrate judge or district judge who will issue an arrest warrant. The warrant should then be delivered to the U.S. Marshals Service or appropriate agency for execution. Once the fugitive is in custody, he should be taken before a magistrate judge and informed of the grounds for his arrest. He should also be informed that he has the right to an extradition hearing under 18 U.S.C. § 3184, but that if he wishes to waive that right he may do so in writing. Although there is no provision for the appointment of counsel in extradition cases, the magistrate judge may nevertheless appoint an attorney at the fugitive's initial appearance. If the fugitive wishes to waive extradition, please notify OIA immediately.

Please note that the Bail Reform Act is not applicable in extradition cases, and there is a strong presumption against bail in such cases. Furthermore, it is the policy of the Department of Justice to oppose bail in extradition cases and an AUSA is not authorized to agree to bond without consulting OIA. Therefore, the fugitive will likely remain in custody throughout the extradition proceedings.

Sometime after the fugitive's provisional arrest, the magistrate will schedule a date for the formal hearing required under 18 U.S.C. § 3184. Because the foreign government has not yet made a formal extradition request by providing supporting documentation required under Article 9 of the Treaty, the hearing should not be scheduled at this time.

Please call me at (202) 305-4849 to discuss this matter further. I will be glad to answer any questions. I have samples of various extradition-related pleadings, including waivers of extradition, memoranda in opposition to bail, and extradition hearing memoranda, that I can e-mail to you.

Finally, please keep me apprised of the status of this case, especially after the fugitive is taken into custody for extradition purposes. Thank you for your assistance with this matter.

Sincerely,

Mary Ellen Warlow
Director

By:

Roman Chaban
Trial Attorney

Enclosures